### EX PARTE J. C. KEARBY.

*No. 106.   Decided March 28th, 1896.*

**1.   Contempt of Court—Habeas Corpus as a Remedy.**

The articles, 154, 155 and 173, Code Crim. Proc., clothe the Court of Criminal Appeals with ample authority to issue the writ of habeas corpus, in almost all conceivable cases, and its power to inquire into the grounds of detention is no longer an open question. Following, Ex parte Degener, 30 Tex. Crim. App., 566.

**2.   Contempt—Adjudication for—"Due Course of Law"—Practice.**

A court, in the exercise of its authority to punish for contempt, must make its adjudication of the matter of contempt and assess the punishment. It should find the factum of contempt, and, following this, there should be an order of commitment. "Due course of law" requires that at the very time a citizen is committed for contempt, the proper order of court must be entered and writ of commitment issued. The imprisonment cannot be imposed upon verbal orders to be supplemented by the entry of the order and issuance of the writ afterwards. Ex parte Kearby and Hawkins, ante p. 531.

**3.   Same—Jurisdiction.**

Where a party, who has been imprisoned for contempt upon a void verbal order and without a writ of commitment, sued out a writ of habeas corpus from another court, or judge, for relief, the latter court acquires jurisdiction; the court holding him in contempt loses all further jurisdiction over him as to the particular matter and cannot cure the defects in its void orders or judgments by proper entry, and the issuance of a proper writ of commitment.

**4.   Same—Attorney at Law.**

Where an attorney at law had sued out a writ of habeas corpus to one court for relief from imprisonment for a contempt by another court, the court which originally held him for contempt cannot deprive him afterwards of his right to appear as an attorney and counselor in its forum until he has purged himself of said original cause of contempt. It is beyond the power of such court, under the facts stated, to suspend the relator from such privilege of practicing his profession. (1) Because the right of a judge or court to purge a party of contempt, is not one of the modes of punishment given by law; and (2) The court had lost jurisdiction of the matter. And, where the attorney protesting against such unauthorized demand of the court refuses to purge himself, and is thereupon ordered by the court verbally to be taken

charge of by the sheriff, which is done.  Held: That such restraint imposed upon the liberty of the citizen without accusation and without trial is void for want of authority to make it.

### 5.  Same.

An attorney at law can only be suspended from the privilege of practicing his profession for certain causes, which are enumerated in the statutes, and in accordance with the form therein provided; and, in such cases he is guaranteed the right of trial by jury.  Revised Statutes, Arts. 262, 268.

### 6.  Same—Right to Habeas Corpus.

Since the passage by the Parliament of Great Britain of the act of habeas corpus, no District Judge has ever had the power to send a citizen to jail for an indefinite period of time upon a mere verbal order, and without any writ of commitment, and thereby deprive other courts of competent authority to grant him proper relief.

FROM the County of Dallas.

This was an original application to the Court of Criminal Appeals for habeas corpus in a case of imprisonment for a failure and refusal of relator to purge himself of an alleged contempt of the Criminal District Court of Dallas County.  The case grew out of matters stated in Ex parte Kearby and Hawkins, ante p. 531.  The facts in this case will be found fully stated in the opinion.

The Assistant Attorney-General moved the court to dismiss the writ of habeas corpus, and his motion, for that purpose, will be found reported in full in the case of Ex parte Kearby and Hawkins; which, it seems, was agreed should be used also in this case.

*P. B. Miller, J. C. Muse, E. G. Williams* and *Stillwell H. Russell* for relator, filed the following traverse to the motion to dismiss:  "Now comes the relator, J. C. Kearby, by his attorneys, and makes known to the court as heretofore made known in his application for writ of habeas corpus, which was granted by the Hon. Jno. N. Henderson, judge of this court, and which is numbered on the docket of this court 105; that when he was relieved from confinement in the county jail of Dallas County by the writ granted by Judge Henderson, and his having entered into bail in the sum of $500 for his appearance before this court on Monday, March 2nd, 1896, he at said time was acting as counsel for C. A. Dawson, whose case was on trial in the Criminal District Court of Dallas County, charged with a felony, returned to said court room and respectfully took his seat among the counsel engaged in said case, and at the same time the relator, W. E. Hawkins, also took his seat in a respectful manner among the counsel engaged in the trial of said cause, and immediately upon relator taking his seat as stated, the court, of its own motion, stopped the case on trial and said that, 'Neither Major Kearby or Mr. Hawkins would be permitted to proceed with the case on trial until they had purged themselves of contempt.'  Your relator says that this honorable court having granted the writ of habeas corpus, and he having complied with the terms thereof, namely the execution of bond for his appearance before this court on Monday as stated above, he made his appearance, as stated, in a respectful way and manner in said Criminal District Court room, believing, at the time, that whatever order had

been made by said Criminal District Judge was suspended by the writ being granted by the Hon. Jno. N. Henderson, judge of this court. He furthermore says, that the said Criminal District Judge was aware at the time that your relator and his corelator, W. E. Hawkins, had been released upon said writ and given bond for their appearance as stated, but notwithstanding this fact and knowledge on the part of the said Criminal District Judge, the judge, of his own motion, announced from the bench that neither your relator or the said Hawkins would be permitted to proceed with the case on trial until they had purged themselves of contempt, and this was said by said Honorable Criminal District Judge in the absence of a purpose manifested by either your relator or Hawkins to go on with the case. Whereupon your relator arose and said in substance: 'Your Honor, I have commited no contempt, and will not purge myself for what I have not done,' and took his seat without further statement. And then Judge Clint, addressing the sheriff, pointed at relator, and in a very excited manner, and in a peremptory tone, said to the sheriff, 'Take that man back to jail.' At this juncture, W. E. Hawkins arose, and in substance, said to the court: 'With all respect to the court, I desire to say, that while the official position which I hold here is a subordinate one, it is, nevertheless, one which is recognized by the laws of Texas, and I feel that I have a duty to perform in the further prosecution of this case.' Judge Clint replied: 'Not until you have purged yourself of contempt.' Hawkins said: 'Will the court kindly intimate what the court deems necessary for me to do to purge myself of contempt.' The court replied: 'You are a lawyer, and are presumed to know.' Mr. Hawkins said: 'Do I understand the court to refer to the message sent to me to the jail by the court?' and the court replied affirmatively. Mr. Hawkins retired. During this time your relator had been taken hold of by the sheriff, under the command of the court, to 'Take that man back to jail.' Whereupon, J. C. Muse, of counsel in the case, and a law partner of relator, arose and addressed the court, and stated that he excepted to the court's refusal to allow relator to proceed with the case, as he was of leading counsel in the case, and employed by the defendant, Dawson, and also excepted to the proceedings had and done in the presence of the jury, as being of great prejudice to the defendant, Dawson; and Judge Muse further stated that he thought the court had no right to order relator to jail as relator had only stated to the court that he was guilty of no contempt, and did not intend to purge himself for what he had not done, as that expression on the part of relator was merely a disclaimer of contempt, and that as the Court of Criminal Appeals had granted a writ of habeas corpus, and set it for hearing on Monday morning at 10 o'clock, it would then be determined whether relator was or was not guilty of the contempt alleged, and as the alleged matter of contempt was then pending for the determination of the higher court, and in view of the disclaimer made by relator, he, as counsel in the case, was of the opinion and believed that relator should not be committed to jail; and defendant, Dawson, deprived, of

relator's services as leading counsel in the case; and it was also stated by Judge Muse, that one of the grounds stated by relator in his application for a writ of habeas corpus was, that he was in law, and as a matter of right entitled to proceed in the defense of his client, Dawson, whose case was then on trial. Whereupon, the court said to Judge Muse, that there was no man in whom the court had a higher regard, both as a man and lawyer, than he did for Major Kearby, then it was that relator, upon the mentioning of his name again by the court, and while in the custody of the sheriff, said to the court: 'Your honor, I except to the court in personating me before the jury, and if the court wants to say anything of a personal nature to me the court should say it on the outside of the court house.' Judge Clint then remarked: 'What I said was meant in all kindness,' when relator replied: 'I do not want you to be kind to me; I want you to be just as mean to me as you can, you can never redeem yourself with me for what you have done to-day.' Whereupon the court repeated his order: 'Take that man on to jail,' and the sheriff put your relator in jail. Relator shows to this Honorable Court that before the remarks last quoted above were used by relator, and in answer to a written statement presented to the court in behalf of W. E. Hawkins by S. B. Hawkins, the court said (referring to the statement of W. E. Hawkins): 'This statement is insufficient; tell both of those men (referring to relator and Hawkins) that nothing but an unconditional, unqualified apology to this court and jury, made in writing, will be sufficient.' Relator further says that, after he had been taken from the court room by the sheriff in obedience and under the oral order stated first above herein, his associates in the trial of the case against Dawson arose and requested the court to fix the time of confinement of relator, and reminded the court that he had not committed relator to jail for any definite or specific time, and the court refused to state anything except that he (relator) would have to stay in jail until he purged himself of contempt. Judge Muse replied: 'That order is indefinite, for it might last always,' and the court told Judge Muse to sit down, that he would make no other statement of the time relator was to stay in jail.

"Your relator further says, that afterwards, and when Judge Clint was informed that another application for writ of habeas corpus had been prepared, and one of the grounds stated in the said application for the writ was that in committing relator to jail for the second time (each time being on oral orders) no definite time had been fixed for the confinement of relator; the judge of said Criminal District Court stated, in open court, after relator had been removed and was confined in jail, that he would fix the time of punishment until 9 o'clock that night; then told his clerk, namely, H. H. Williams, to enter judgment confining relator in jail, and cause the same to read that he stand committed until 9 o'clock that night, namely, Saturday night. And after this the clerk of the Criminal District Court informed the clerk of this honorable court that the time had been fixed to keep relator until 9 o'clock—this,

from all the circumstances of the case, was evidently done at the instance of the Honorable Judge of the Criminal District Court, and your relator so charges the fact to be.

"Relator further says, that he appends hereto and makes a part of this, and marked Exhibit 'A,' the order which was afterwards reduced to writing committing your relator to the jail in the first instance and upon which the first writ of habeas corpus was granted is marked Exhibit 'A;' but your relator says, as hereinbefore stated, the order made by the Criminal District Judge at the time was an oral one, and that this Exhibit 'A' was written out on the Monday following the imprisonment, and purports to be the order made by the court, but which was not entered by the court until said Monday following; but your relator says that no commitment or mittimus was ever issued or was he imprisoned under any written order or process whatever. (Exhibit 'A' will be found set out in full in Ex parte Kearby, ante p. 531.—Reporter.)

"Your relator further says, that the order purporting to be the judgment of the court, committing your relator to jail a second time, is marked exhibit 'B,' and hereto attached (see exhibit 'B,' copied in the opinion—Reporter), but he says it does not truly recite the proceedings had and done therein, but he affirmatively says, that what was had and done therein is stated heretofore in this. Your relator further says, that notwithstanding he has been by this honorable court granted a most gracious writ of habeas corpus in two separate and distinct instances, and for trial and hearing before this court at days set apart by order of this court, the said Honorable Criminal District Judge still persists in refusing and preventing your relator from appearing in his court and participating in the trial of the defense of his client, who stands arraigned before said Criminal District Court on a very grave charge of felony, and that while the matters of contempt have been suspended pending in this honorable court, the result of said suspension has been denied to the relator by the Honorable Criminal District Judge, and he verily believes and here says, that as an officer in this court, and as an officer of the Criminal District Court, and protected as he is by the writs of habeas corpus granted from this court, that the Honorable Criminal District Judge is himself in contempt of and acting in violation of that which is due to the mandates and process of this honorable court, and that which is due to your relator by and through said mandates and process.

"Your relator says that, in addition to the oral orders sending him to the common jail of Dallas County as a penalty for the alleged and supposed contempt, the Honorable Criminal District Judge has added another punishment thereto, to-wit: suspending your relator from the practice of his profession before his court.

"Wherefore relator prays, that his application for the writ will be duly inquired into, and that this honorable court will, upon hearing all the facts connected with the illegal, arbitrary and tyrannical action as relator believes and alleges, of the Honorable Criminal District Judge, will dis-

charge your relator from the illegal imprisonment without delay and without cost."

After the opinion below was delivered, discharging the relator, *Mann Trice*, the Assistant Attorney-General for the State, filed the following motion for rehearing, viz:

"Now comes the State by attorney and moves the court to set aside the judgment discharging the relator herein, for the reasons following, to-wit:

1. "The court erred in holding that a warrant of arrest or commitment was necessary to be issued before the relator in this case could be lawfully taken into custody, in this: the undisputed evidence of Whit Webb, James S. Lewis, E. C. Haynes, H. C. Hoskins and Ben E. Cabell, all show that relator, at the time of his commitment, used violently abusive, profane and indecent language in a public place, to-wit: in the court room of the Criminal District Court of Dallas County, Texas, while said Criminal Court was then in session. As related by one of the witnesses on page 36 of the record of the evidence, 'when he put his hat on (witness referring to the relator), turned his mouth toward the court, and then made a kind of a mouth at the court, and said, 'Dam son-of-a-bitch,' it was loud enough to be heard over the court room. It was in an undertone, but every juryman in the box heard it. Every juryman heard it, because I heard them speak of it. This was during court, and in the presence of the judge, on last Saturday afternoon.' This language was used pending the colloquy between Judge Clint and the relator, wherein relator was repeatedly by the court ordered to jail. I respectfully submit, that the language above used and in the manner used, constituted a violation of the penal laws of this State, and that under Arts. 226 and 227, Code Crim. Proc., the judge, in whose presence the offense was committed, could verbally order the arrest of the offender. Article 227 reads as follows: 'A peace officer may arrest without warrant when a felony or breach of the peace has been committed in the presence or within the view of a magistrate, and such magistrate shall verbally order the arrest of the offender.' It is therefore apparent that the verbal order of the judge was sufficient, and no warrant of commitment was necessary in this case.

2. "Independent of the question as to whether the relator used any profane language in the court or not, he nevertheless placed himself in contempt of court, when he disputed the word of the court and questioned the veracity of the court by telling him that he had been guilty of no contempt of court. The court told him that he had been adjudged in contempt of court, and the record recites that the relator used profane language in the hearing of the court. It was not denied on the trial of this case that the relator disputed the court's word, when he charged him with being in contempt. This of itself was sufficient cause for the trial court to have adjudged the relator guilty of a second contempt of court.

3. "This court, in its opinion, on page 7, misconceives the

scope and purport of my contention on the trial of this case. I have never contended, and do not now contend, that any court could imprison a citizen in jail for an indefinite period of time, and that no other court could be authorized to grant him relief. I contend that, under Art. 262, Rev. Stats. of 1895, that, 'each attorney-at-law shall be subject to fine or imprisonment by any court in which he may practice, for misbehavior or contempt of such court.' That the amount of punishment or fine or term of imprisonment is, by the terms of this statute, vested within the discretion of the court, with this limitation, however, that the fine or punishment imposed should be reasonable; and, should the court inflict upon a citizen unreasonable punishment for contempt, or commit him for unreasonable length of time, I think that the judgment, in that regard, should be reviewed, and the prisoner granted relief. My contention then is, that the relator was ordered to be imprisoned for a period of about six hours, or until he purged himself of contempt, and that in view of his conduct, that this punishment was not unreasonable or excessive.

4. "Again, the court misconceives my position in assuming that I contend, that under no circumstances would a writ of habeas corpus lie in favor of a party committed for contempt. My contention on the trial of this case, as it is now, that the writ of habeas corpus from a commitment for contempt, will not lie unless the judgment from which it is sought to be relieved is absolutely void. I concede that if the judgment is void, the relator would be entitled to relief, but my entire fight in this case is based upon the ground that this court acquired no jurisdiction, because the judgment was not absolutely void. This is verified by reference to the first paragraph of the motion to dismiss this application, which reads as follows: 'Because said application fails to show a want of jurisdiction, on the part of the said judge; to make and enter the order of commitment for contempt herein, and wholly fails to show that said judgment is absolutely void.' I therefore respectfully ask, that should the court not grant this motion to set aside the judgment, that the opinion be so modified as to show the contention I actually made on the trial of this case.

5. "The honorable trial court did not err in ordering relator into custody before the entry of the judgment and issuance of the warrant, and it was competent for the judgment to be entered after the offender had been removed from the court room. The punishment for contempt, under all of the authorities, is summary. The use of this term necessarily precludes the idea that the due course of law, applicable in cases of defined offenses, should govern. That the court had the power to enter the judgment after the relator left the court room, is made clear by the case of Ex parte Terry, 128 U. S., p. 290. In that case the judgment was entered, and all process issued after the offender had left the court room. He was adjudged guilty of contempt and given a period of six months in jail. The Supreme Court of the United States,

remanded him to serve out his time. In view of the authority of this case, I deem further comment unnecessary.

"*J. C. Muse* and *Stillwell H. Russell*, who reside in the city of Dallas, appear to be counsel of record for the relator, and I respectfully ask that a copy of this motion be served on each of them.

"Respectfully submitted."

[This motion for rehearing was overruled without a written opinion. —Reporter.]

HENDERSON, JUDGE.—The relator in this case applied for a writ of habeas corpus to this court, which was granted. Evidence was adduced on the trial of the case, from which it appears, that on the morning of the 29th of February, 1896, (which was Saturday) in the Criminal District Court of Dallas County, J. C. Kearby, the relator, and W. E. Hawkins, were imprisoned in the county jail of said county, on the verbal order of the District Judge. In the afternoon of the same day, the said parties applied to Judge Henderson, of the Court of Criminal Appeals, for a writ of habeas corpus, which was granted, said writ being made returnable before the full court on Monday, the 2nd day of March. Said parties, by the order of the judge granting the writ, were released in the interim on bonds, which they gave. On their release (which was between 2 and 3 o'clock in the afternoon) they came into the said Criminal District Court, to re-engage in the trial of a criminal cause then pending and being tried before said court, said Hawkins representing the State, and J. C. Kearby representing the defendant. On their return into court, it appears that the District Judge stated to them that they could not proceed with the trial of the case (which was then before the court) until they had purged themselves of contempt. Hawkins arose, and asked the court what he should do to purge himself of contempt. The court replied: "You are a lawyer, and ought to know." Kearby, the relator, then arose from his place at the table, and said: "Your Honor, I have not committed any contempt, and I decline to purge for what I am not guilty of." The court then ordered the sheriff to take him to jail. This is, in substance, the relation of the matter by the witnesses introduced for the relator, to-wit: Kearby, Muse, W. E. Hawkins, S. B. Hawkins, Green Williams and Henry Williams. Lewis and Cabell, who were introduced by the State, did not materially differ from the testimony of the relator's witnesses as to what occurred preceding the order by the court to put the relator in jail. Webb, Haynes and Hoskins, three witnesses introduced by the State, indicate by their testimony that something more occurred before the relator was ordered to jail. They state, as well as Cabell, that when Kearby came into the court room he picked up a pitcher in front of him, and set it down to one side, in such a manner as to be heard in the court room. They also testify that during the colloquy that ensued between the judge and the relator, before he was taken from the court room he became quite boisterous and excited; and they testify that he used a profane epithet, ap-

plying it to the judge in such manner as that it could be heard by those immediately around him, and one witness testifies that it was heard by the jury. We gather, however, from the testimony in the case, that the order of the judge to imprison the relator was made, as testified to by nearly all of the witnesses, almost immediately on the parties making their appearance in the court room, so that what afterwards occurred is not so material to a decision of this case; and we are supported in this view by the order of the judge himself, which is as follows:

"SATURDAY, February 29, 1896.

"It is ordered by the court that J. C. Kearby be, and he is hereby adjudged to be again in contempt of this court, in that the said Kearby, being already in contempt of this court, as appears from the records thereof, and not having purged himself of said contempt, was informed by the court, after having been released by another tribunal, by writ of habeas corpus, from jail, and on again appearing thereafter in this court, that he nor Mr. Hawkins, who had also been released by said habeas corpus proceedings, could not again appear in the case then on trial until they had purged themselves of said contempt; whereupon said Kearby arose, and said that he had been guilty of no contempt of this court, and that he did not intend to purge himself of what he had not done, and thereupon the court ordered the sheriff to take charge of said Kearby, who insisted upon addressing the court. And the court, in reply to a question addressed by Mr. Hawkins, stated that he was speaking in all kindness of Mr. Kearby, who again, in a boisterous manner, made the following statement: 'I don't want you to treat me kindly. You can talk to me out of court. I want you to treat me as mean as you know how. I want to say that nothing you can do will ever make me look upon you with regard again;' and was continuing to talk in like manner, when he was ordered more than once to take his seat, which he refused to do, when he was ordered to jail. For all of which, it is ordered by the court that said J. C. Kearby be punished for said contempt by imprisonment in the county jail until 9 o'clock to-night, or until he shall have purged himself of said contempt. It is therefore ordered, adjudged and decreed by the court, that the said J. C. Kearby be, and he is hereby, remanded to the custody of the sheriff of Dallas County, Texas, until 9 o'clock tonight, or until he shall have purged himself of said contempt." Said order indicates that the judge required of the relator to purge himself of the contempt committed in the morning, before he would be permitted again to appear in the case then on trial. We would observe, in this connection, that the order in question was not made at said time. In fact, no order, except the direction to the sheriff to take him to jail, was made. The nature of the contempt was not announced, nor was the clerk instructed to enter any order, although J. C. Muse insisted before the court that he should make some order defining the time of imprisonment, whether it was to be for life or a term of years. But the judge refused to entertain the request. Mr.

H. H. Williams, the clerk, says, that some fifteen minutes thereafter the judge instructed him to inform the sheriff that the order of imprisonment was until 9 o'clock that night.   He further states that, at the suggestion of the judge, on Monday or Tuesday thereafter, he wrote up an order of commitment to be entered and handed it to the judge, who stated he would reform it, and give it back to him for entry on the minutes.   The order in question, according to the testimony of this witness, was entered on the record on Wednesday, March 4th.   The writ of habeas corpus in this case was sued out, and the writ granted between 6 and 7 o'clock of said Saturday evening.   To said writ the sheriff made the following return:

"I hold the applicant by virtue of a verbal command of Hon. C. F. Clint, Criminal District Judge of Dallas County, commanding me to take relator to jail, without any further statement to me by the judge, or other authority; and, in pursuance of such verbal order, I placed the relator in jail, and subsequently, some time thereafter, I received a telephone message at the jail, directing me to hold relator until 9 o'clock that night—Saturday night, February 29th, 1896—and then release him; and, upon the issuance of the writ of habeas corpus herein by this court, I released relator upon said writ, after taking his bond in the sum of five hundred dollars, which is hereto attached.

[Signed]                    "Ben E. Cabell,
"Sheriff Dallas County, Texas."

It will be seen from this that no writ of commitment was ever issued in this cause.   This is a substantial relation of the salient facts in the case.

Before proceeding to a discussion of the case, we will quote the articles of our statute bearing upon the subject:

Art. 154.   "Every provision relating to the writ of habeas corpus shall be most favorably construed in order to give effect to the remedy and protect the rights of the person seeking relief under it."

Art. 155.   "The Court of Appeals, or either of the judges, the District Courts, or any judge thereof, the County Courts, or any judge thereof, have power to issue the writ of habeas corpus; and, it is their duty, upon proper application, to grant the writ under the rules herein prescribed."

Art. 165.   "The writ of habeas corpus shall be granted without delay by the judge or court receiving the petition, unless it be manifest, by the statements of the petition itself, or some documents annexed to it, that the party is entitled to no relief whatever."

Art. 173.   "The writ of habeas corpus is intended to be applicable to all such cases of confinement and restraint, where there is no lawful right in the person exercising the power, or where, though the power in fact exists, it is exercised in a manner or degree not sanctioned by law."

These statutes clothe this court with ample authority to issue the writ of habeas corpus in almost all conceivable cases; and its power to in-

quire into the grounds of the detention is no longer an open question. See, Ex parte Degener, 30 Tex. Crim. App., 566. In the former case of Ex parte Kearby and Hawkins, tried at this term of the court (ante p. 531), we held, that it was the duty of the court at the time to make its adjudication of the matter of contempt, and to assess the punishment. We quote from that case as follows: "As we understand it, the right of authority requires, on the part of the court, that it should find the factum of contempt." See, 4 Ency. Pl. & Prac., p. 798; Ex parte O'Brien (Mo.) 30 S. W. Rep., 158; Ex parte Robertson, 27 Tex. Crim. App., 634. And following this in regularity there should be an order of commitment. See, Ex parte Robertson, 27 Tex. Crim. App., 630; citing, Ex parte Buford, 1 Cranch, C. C., 456; Fed. Cas. No. 2149. Both by reason and authority, we hold that no court, under our system of government, should be authorized to imprison a citizen for a contempt, unless at the very time he is so committed the proper order is made and entered, and the writ of commitment issued for the purpose of his detention. This, we understand, in this respect, to be due course of law. Nor, in our opinion, is it competent for any court, unless such steps are taken, for it, after a party detained under its verbal orders has sued out a writ of habeas corpus, to then make its judgment, and have the same entered, and in this manner supersede the jurisdiction of the court granting the writ." To the same effect, see State v. Matthews, 34 N. H., 453; Ex parte Wright, 65 Ind., 504; Easton v. State, 29 Ala., 552. Mr. Rapalje, in his work on Contempt (page 121), says: "A party may be ordered into custody without a warrant, yet one should be at once made, and the cause of commitment therein stated." As stated before, the learned judge in this case did not at the time state any finding of the matter of contempt, nor did he make any adjudication as to the fine or imprisonment imposed, nor has ever any writ of commitment been issued in this case. Both of these steps should have been taken, and without both no court ought to be armed with the power to imprison a citizen, no matter what the contempt may have been. At the time it appears all that was done was to order the relator to jail, and that for an indefinite time; and subsequently (from fifteen minutes to a half hour) the court, it appears, informed the clerk that the confinement would be until 9 o'clock; but this was in the absence of the prisoner, and while he was undergoing an indefinite punishment. The entry of the order after this court acquired jurisdiction was equally without authority. Article 182, Rev. Crim. Code Proc., provides: "When the return of the writ has been made, and the applicant brought before the court, he is no longer detained on the original warrant or process, but under the authority of the habeas corpus, and the safe keeping of the prisoner, pending the examination or hearing, is entirely under the direction and authority of the judge or court issuing the writ, or to which the return is made." It would have been a very easy matter in this case, if the relator was in contempt of court, for the judge to have so formally adjudicated; and in the mean-

time to have authorized the sheriff to detain the relator until the proper entry was made, and the writ of commitment issued, which was the authority for the sheriff to imprison him. So far as the record discloses, in this case, the sheriff never had more than a verbal order of the court to imprison the relator. If the court can do this without any statement of cause, without any limit as to time, the District Judge is vested with more power than could be rightly conferred upon any one man under our system of free government.

Concede, however, that the order of the court could be afterwards entered, and relator could be imprisoned under it without any writ of commitment, let us examine the nature of the order in question. It will be borne in mind, that the relator in this case had been sent to jail on account of an altercation occurring between himself and Hawkins, during the trial of the Dawson case, on the morning of the 29th of February. No order was ever made and entered in that case, and no writ ever issued. Relator sought relief by application to this court by writ of habeas corpus, which was granted. He was enlarged on his bond, and the habeas corpus trial set for Monday, March 2nd. In this state of case, the relator re-enters the court room to participate in the trial of the case in which he was of counsel for the defendant. This he had a perfect right to do; and the attempt of the judge to exclude him from the case unless he purged himself of an alleged contempt (the trial of which contempt was then pending before this court), was without authority of law, and was well calculated to arouse in the relator the strongest feelings of resentment on account of the unwarranted action of the court. In the first place, the right of a judge to purge a party for contempt is not one of the modes of punishment given by law; and, in the second place, the court had lost jurisdiction of this matter. The relator, as it occurs to us, very properly protested against this unseemly action of the court, insisting that he was not guilty of any contempt, and that he would not purge himself of what he had not done. At this juncture, it appears from the written order afterwards entered, "that the court thereupon ordered the sheriff to take charge of the said Kearby." And the court then, as it appears from said order, proceeded to discuss the matter, referring to the relator, and stated that he was referring to him in all kindness. The relator, as it appears, responded in a boisterous manner that he did not want the court to treat him kindly, that he could talk to him out of court, that he could treat him as mean as he knew how, and nothing he could say would cause him to again look upon him with regard; and thereupon the relator was ordered to jail. Looking to the order itself, it occurs to us that the improper action of the court in this matter was the moving cause for what subsequently occurred, and that the relator could hardly be considered in contempt in insisting on his right to appear in the case, as he did, without being compelled to humiliate himself before the court and jury, by complying with the unwarranted demand of the court that he should in some manner purge himself. The court had no power to suspend relator from the privilege of practicing

his profession.    Thiscan only be done for certain causes enumerated in the statute, and in accordance with the form therein provided; and in such cases he is guaranteed the right of trial by jury.    See, Rev. Civil Stats., Arts. 262–268, inclusive.

We would not be understood as holding that some of the subsequent conduct of the relator, as testified to by the witnesses in this case was not of a character to have authorized the court to have visited upon him punishment for contempt, but there is no pretense in the case that such was the basis of the order made by the judge.    Nor is it our purpose to in any wise depreciate or disparage the power of the courts to preserve at all times the authority and dignity of their courts.    The statutes on this subject give them, in our opinion, too little power in this regard; but this power must in every case be exercised according to the forms of law; and whenever those forms, which are the safeguards of the citizen under our free institutions, are overstepped or disregarded, it becomes a dangerous precedent, paving the way to usurpation and oppression.    It is the duty of the citizens, especially members of the profession, to uphold the authority of the courts by a respectful decorum in their presence.    This respect, however, will best be conserved by the judge on the bench himself setting an example in the due observance of the laws of the land; and if at any time he should be constrained to punish for contempt on account of a violation of those rules regulating the proper conduct of courts, he should do so with a kindly, yet a firm and unflinching hand; but, above all, he should enforce his authority according to the rules of law.

The Attorney-General contends that upon a mere verbal order, and without any writ of commitment, the District Judge has the power to send the citizen to jail for an indefinite period of time, and that no other court is authorized to grant him any relief.    This may have been the rule aforetime, but has not been in any English-speaking country since the passage by the Parliament of Great Britain of the act of habeas corpus, which Blackstone characterizes as the great bulwark of our constitution, a second Magna Charta, as beneficial and effectual as that of Runney-Mead.    Mr Blackstone further says:    "Magna Charta only in general terms declared that no man should be imprisoned contrary to law.    The habeas corpus act points him out effectual means as well to release himself though committed even by the king in council, as to punish all those who shall thus unconstitutionally misuse him."    2 Bl. Comm., p. 437.    He further says:    "Of great importance to the public is the preservation of this personal liberty, for, if once it were left in the power of any—the highest—magistrate to imprison arbitrarily whomever he or his officers thought proper, there would soon be an end of all other rights and immunities.    Some have thought that unjust attacks, even upon life or property, at the arbitrary will of the magistrate, are less dangerous to the commonwealth than such as are made upon the personal liberty of the subject.    To bereave a man of life, or by violence to confiscate his estate, without accusation or trial, would be so gross

and notorious an act of despotism as must at once convey the alarm of tyranny throughout the whole kingdom, but confinement of the person by secretly hurrying him to gaol, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore a more dangerous, engine of arbitrary government. To make imprisonment lawful, it must either be by process from the courts of judicature, or by warrant from some legal officer having authority to commit to prison, which warrant must be in writing, under the hand and seal of the magistrate, and express the causes of the commitment, in order to be examined into, if necessary, upon a habeas corpus. If there be no cause expressed, the gaoler is not bound to detain the prisoner; for the law judges, in this respect, saith Sir Edward Coke, like Festus, the Roman governor, that it is unreasonable to send a prisoner, and not to signify withal the crime alleged against him." See, 1 Bl. Comm., pp. 135, 136. In conclusion we hold that, the known rules of law having been violated in the contempt proceeding against the relator, he is ordered to be released, and discharged from custody.

*Relator Released and Discharged.*