## EX PARTE FRANK SENTELL

No. A-4383. Decided February 24, 1954.
Rehearing overruled April 21, 1954.
(266 S.W. 2d Series 365)

*John D. Coats,* of Austin, *John E. Sentell,* of Snyder, and *David J. Morris,* of Brownwood, for relator.

*L. D. Hawkins,* of Breckenridge, for District Judge Hon. Sterling Williams.

PER CURIAM.

In this original habeas corpus proceeding, relator, Hon. Frank Sentell, seeks release from an order of the district court finding him guilty of contempt of court, and assessing his punishment at a fine of $100 and confinement in jail for 72 hours.

The matters under review arose in a hearing of a petition for a temporary injunction sought by Wilson et al, defendants, in a suit filed by Frank Stephenson, as next friend for his moth-

er, Sallye I. Stephenson, to cancel a deed executed by her to Wilson, alleging that it was executed while she was so mentally infirm that she did not know what she was doing and had accepted much less money than the property was worth. Relator was attorney for plaintiff.

In their answer the Wilsons specially denied that Sallye I. Stephenson was of unsound mind when she executed the deed or that any overreaching was exercised by them on her to get the deed. In their cross action and prayer for injunction the Wilsons were joined by Mrs. Sallye Stephenson as cross plaintiff. They alleged that the latter did not wish to retract the deed; that she did not lack mental capacity; that Frank Stephenson had no authority to bring suit in her behalf, but was attempting to "perpetrate a vicious fraud" upon the court. They alleged that Frank Stephenson had on several occasions threatened to do bodily harm to all cross plaintiffs and damage to the property; that he had often physically assaulted Sallye Stephenson; that Mrs. Frank Stephenson had one time attacked Mrs. Sallye Stephenson, breaking the latter's left arm, that this situation compelled her to have Frank Stephenson placed under a peace bond; that cross plaintiffs believed he would carry out his threats of further injury to them and to the property unless restrained.

Mrs. Sallye Stephenson also filed a disclaimer of any interest in the land, denied that Frank Stephenson had any interest in it and prayed that she be permitted to represent herself in the suit without hindrance from him.

It was in this background of hard feeling between the parties that the trial judge began a hearing on the prayer for injunction.

■ We have concluded that the validity of the contempt order must be measured under the principles applied in the case of Ex Parte Fisher, 146 Texas, 328, 206 S.W. 2d, 1000.

That case applies the fundamental rule that a proceeding like this is not an appeal from a court judgment but is a collateral attack on a contempt order, which can be sustained only after it is shown that the order is void; and the innocence vel non of relator is immaterial in the determination of its validity. Among supporting authorities cited is Ex Parte Testard, 101 Texas, 250, 106 S.W. 319.

Recognizing this limitation upon the power of this court, we said in the Fisher case: "The inquiry before us is whether or not

a citizen is restrained of his liberty without due process of law. In determining this matter we are restricted to the question of jurisdiction, the lack of which would render the judgment void. In passing on the court's authority we look to the jurisdiction of the subject matter involved in the alleged contempt, jurisdiction of the person, and the power of the court to render the particular judgment. * * * We may consider the facts only for the purpose of determining whether they constituted acts sufficient to confer jurisdiction upon the court to make the particular order."

The facts in the present case are very different from those in the Fisher case, so it seems necessary to set out the several verbal clashes between relator and the trial judge which the latter held contemptious.

After two preliminary matters had been amicably disposed of the hearing continued with fair decorum while Mr. Armstrong was questioning Frank Stephenson until he began asking Stephenson about threats allegedly made by him against and about Wilson. Then the following occurred:

"Q. You didn't threaten his life?

"A. Could I make an exception to that?

"Q. You answer the question. The Court will rule on whether you answer them or not, Mr. Stephenson?

"A. He told me what he was going to do—

"MR. ARMSTRONG: I didn't ask you what he told you, I asked you—read the question back mister reporter?

"MR. Sentell: If the Court please, let the witness do the answering.

"MR. ARMSTRONG: He is not going to make any speech to me, Mr. Sentell. I don't want any speeches.

"THE COURT: Just answer the question.

"MR. SENTELL: If the Court please, we are going to try to protect the witness within his legal right. And, the idea of Counsel bulldozing the witness and trying to make him answer his way, and cut him off when he wants to, I don't think should go in this court.

"THE COURT: He can answer the question in plain English. Go ahead and just answer the—

"MR. SENTELL: And, he is entitled always to his explanation.

"THE COURT: Go ahead.

"MR. SENTELL: It is fundamental.

"MR. ARMSTRONG: Mister reporter, read the question back that he hasn't answered as of yet.

"THE REPORTER: Do you have any idea which one it is?

"MR. ARMSTRONG: About whether he was in a composed manner when he threatened to kill Mr. Frank Wilson.

"MR. SENTELL: We object to that statement of the question.

"THE COURT: Just read the question, that is not the way the question was. Just find the question and read it, and that will settle it.

"THE REPORTER: Now, here is the question that Mr. Sentell objected to, is that the one you want?

"MR. ARMSTRONG: Yes, uh huh.

"THE REPORTER: 'You didn't threaten his life?'

"MR. ARMSTRONG: Now, that is a simple question I asked you.

"THE COURT: Now, just answer that question, Frank.

"MR. SENTELL: Now, does the Court require him to answer just 'Yes' or 'No'?

"THE COURT: Well, I don't see any other way you could answer it.

"MR. SENTELL: If the Court please, under the fundamental rules any time a witness answers 'Yes' or 'No,' he has got a right to explain his answer.

"MR. ARMSTRONG: But he must first answer it 'Yes' or 'No,' then he has a right to explain it, that is true.

"MR. SENTELL: He has a right to explain it.

"MR. ARMSTRONG: But, he had started explaining it.

"THE COURT: Both of you sit down and let him answer it, did or—the question is did you threaten the man's life, answer whether you did or didn't.

\* \* \*

"Q. Had you talked to Mr. Wilson before the incident that you detailed to the Court, a few days before or a few weeks before?

"A. I talked to him a few weeks before.

"Q. And, as a matter of fact you have asked him to go try to buy a piece of property off of your mother's property so he could sell it to you, didn't you?

"A. Yes, I asked him what he—

"Q. And, you got furious because he wouldn't—

"MR. SENTELL: Just a minute, if the Court please, if Counsel will let him finish his answer instead of trying to drown him—

"MR. ARMSTRONG: He was making a speech when he said yes he did.

"MR. SENTELL: If the Court please—

"THE COURT: Well, let him ask the question, and then object—

"MR. SENTELL: —Counsel's tactics with his big booming voice is to drown him out before he finished.

"THE COURT: Well, all right, let him ask the question and then state your objection, he hasn't finished the question. Go ahead and ask the question.

"MR. SENTELL: He was answering when he broke in, and that is why we are objecting.

"THE COURT: No, he broke in with the answer. Go ahead and ask your question.

"MR. SENTELL: If the Court please, we ask for—we call for a reading of the record up to that point.

"THE COURT: Well, now, I heard it, and I said the answer broke in on the question. I don't want to argue about it. Ask your question.

"MR. SENTELL: You mean, while he was answering (and other words which the reporter not able to separate from other speakers' words)—

"THE COURT: Yes, sir; yes, sir; yes, sir, before Armstrong—before—before Armstrong—wait a minute—

"MR. SENTELL: —(a flow of words which the reporter not able to separate because of other speaker's words)—note our exception to the ruling of the Court—

"THE COURT: Before—sit down just a minute, or I am going to fine you for contempt—before Armstrong finished his question, the witness broke in with an answer. Now, I don't want to hear any more about it.

"MR. SENTELL: I would like a reading of the record on that, I didn't hear it that way.

"THE COURT: I don't mean to argue with you about it, and the next time you argue with me I am going to fine you for contempt.

"MR. SENTELL: I am going to make my exception every time I want to in this record.

"THE COURT: Well, I am going to hold you in con—

"MR. SENTELL: It is my duty to do so.

"THE COURT: All right, you are in contempt; and, I am going to fine you $100.00.

"MR. SENTELL: For what?

"THE COURT: For contempt of court.

"MR. SENTELL: For what?

"THE COURT: For arguing with the Court when I have made a ruling, and told you that it was final.

"MR. SENTELL: I am going to make my exceptions (and other words which the reporter not able to separate from other speaker's words)—

"THE COURT: Well, now, I find you $100.00 for contempt, and the next time it is going to be higher. Do you want to argue?

"MR. SENTELL: I am still making my exception, that is what I have done.

"THE COURT: Well, I acknowledged your exception. Now, I am going to expect you to pay that $100.00 into court at 1:00.

"MR. SENTELL: (utterances which reporter not able to translate.)

"THE COURT: Go ahead with your questions."

The second episode, which terminated in the jail sentence against relator, occurred while defendant (and cross plaintiff) Wilson was on the stand on redirect examination by Mr. Armstrong. It arose as follows:

"Q. Mr. Wilson, when a man threatens you in the tone and the expression as he did—

"MR. SENTELL: Now, if the Court please, we object to that, there is no evidence in here for the support of that question.

"THE COURT: Well, let's see what the question is—go ahead and ask it.

"MR. SENTELL: The question is (and other words the reporter unable to separate from other speaker.)

"THE COURT: The man hasn't finished asking the Question.

"MR. SENTELL: We will ask the court reporter to read the question.

"THE COURT: Well, I will do the asking—go ahead and finish the question.

"Q. You testified about the cursing and in a loud language threatening to kill you didn't you?

"A. Yes, sir.

"Q. A man in that tone of voice and talking in a loud manner, and furious as it was, and threatening to kill you, it makes you think, don't it?

"A. That is right.

"MR. SENTELL: Now, if the Court please, that wasn't—

"Q. That is what you—

"THE COURT: Now, wait, let's get the objection.

"A. That is right.

"MR. SENTELL: Now, if the Court please, that isn't the question that he asked a while ago and I objected to.

"THE COURT: Well, now, just for your benefit, you insisted that there was a question and I say that it wasn't a question, it wasn't finished—now, read it back, reporter, and then I don't want to hear any more of this kind of stuff. Now read that question back that Mr. Armstrong started to ask and didn't get a chance.

"THE REPORTER: 'Mr. Wilson, when a man threatens you with the tone of voice and the expression on the fact like he did you'—and, that is as far as I got.

"THE COURT: Now, Mr. Sentell, you argue that that was a question in the face of me telling you that the question wasn't finished. Now, I don't want to hear any more of this—

"MR. SENTELL: We objected to the question as stated at that time.

"THE COURT: It wasn't no question. You interrupted the man and didn't give him a chance to finish. Now, go slow and I will try to separate this stuff and give you both your full rights.

"MR. SENTELL: Note our Exception.

"THE COURT: You don't have any exception.

"MR. SENTELL: We ask the record to show it.

"THE COURT: Well, I am going to put you in jail, if you keep on.

"MR. SENTELL: (sounds unintelligible to the reporter).

"THE COURT: I am holding you in contempt, and sentencing you to three days in jail. Now, Mr. Haynes, he is your prisoner. I am going to postpone this hearing for three days in the same condition as it now stands.

"MR. SENTELL: Note our exception, and—

"THE COURT: All right, you have your full bill."

These quotations show that in the first episode relator was correct in his contention as to the state of the record; while in the second he was wrong. If the issue before us were confined to what was said by relator, he might be entitled to a discharge under cases like Ex Parte Crenshaw, 96 Texas Crim. Rep. 654, 259 S.W., 587, 31 A.L.R. 1181, a decision by our Court of Criminal Appeals. However, the issue is not so limited, hence we do not decide it.

In his order holding relator in contempt after the first episode, the trial court said: "That at the time that this Court fined the said Frank Sentell $100.00, and in violation of the Court's Rulings, orders and admonitions hereinabove referred to, it was evident to this Court that after the assessing of said fine of $100.00 the said Frank Sentell's attitude, statements and expressions showed a contemptious attitude and disrespect of this Court's orders, and that this Court advised the said Frank Sentell that in view of such attitude he, the said Frank Sentell, was then and there ordered and directed to pay said $100.00 fine into the Registry of this Court on or before 1:00 p.m. of date hereof, and that then and there the said Frank Sentell in his further contemptious attitude stated to the Court 'We will see about that'."

While the reporter's notes recite that there were utterances by Mr. Sentell which the reporter was "not able to translate," that does not disprove the court's statement in his order that Mr. Sentell said "We will see about that."

The second episode, as stated in the above quotations from the statement of facts, is described in the court's order as follows:

"* * * and, the court after having the record read back by the Official Court Reporter, which said record reflected and bore out the Court's previous admonition to the witness, the ruling and objection of the said Frank Sentell that the said question had not been developed by said counsel; and, that the Court then and there admonished the said Frank Sentell to go slow and take things easy and let the Counsel ask and propound the question in full and give the witness time to answer and he, the said Frank Sentell, the proper time to make the objection, and if this rulue was followed that the matter could be straightened out very easily and that he could have and protect his rights, and that in defiance of the Court's suggestions and admonitions the said Frank Sentell continued to argue and harange said Court and insist that the witness be permitted to answer the unfinished question.

"That this Court then and there again admonished the said Frank Sentell that if he continued to argue this point with the Court after the Court had ruled, that this Court would have to hold him, the said Frank Sentell, in contempt and confine him to jail, at which time the Court did not catch the side-bar remark made, but it was evident to this Court from the expression and attitude, of the said Frank Sentell that he then and there, as he had in the past, defied the Court to hold him in contempt."

■ Undoubtedly it was proper for the trial court to conclude from the conduct and appearance of relator, independent of what he said, that the latter was in a "contemptious attitude." He saw relator's attitude, expression, and appearance during the verbal exchanges above quoted, and he found it contemptious. Relator cites us nothing substantial to show that there were no facts to support the judge's conclusion that he was in contempt in the manner stated in the order, although the burden of proof was on him to do so. Ex Parte Lipscomb, 111 Texas, 408, 239 S.W., 1101. The result is that he has failed to show that the order committing him for contempt is void.

■ Relator contends that the order under review is void because it was oral. The record shows that a written order of contempt

was filed after relator was placed in jail on the oral direction of the court to the sheriff; that it was filed with the clerk late in the afternoon of Oct. 26, 1953; and that a proper commitment was at once executed by the clerk and handed to the sheriff. Relator's petition was filed here at 7:30 p.m., Oct. 27, 1953. Since these instruments were in effect at the time the temporary writ of habeas corpus was issued, we must base our decision on them. Ex parte Fisher, supra. Relator's point is overruled.

The order granting a temporary writ is set aside and relator is remanded to the Sheriff of Scurry County, Texas, to carry out the order of the trial court. We note that the commitment directs the Sheriff to hold relator until he has served three days in jail and has paid the $100.00 fine. This is a variance from the court's order, which fines relator $100.00 and sentences him to jail for three days, so we remand the relator to the Sheriff until he has served the three days ordered by the court, since the order is what controls.

Opinion delivered February 24, 1954.

JUSTICES SMITH, joined by JUSTICES GRIFFIN and CALVERT, dissenting.

We respectfully dissent. The rule announced by the majority should not be and, in our opinion, is not the law. The court's judgment in this case is void for the reason that there is no evidence to sustain it. Moreover, even in the absence of supporting evidence, the judgment itself does not contain recitations of facts necessary to its validity.

In the case of Ex Parte Fisher, 146 Texas 328, 206 S.W. 2d 1000, this Court said in part: "Whether he committed the act charged is conclusively determined by the order or judgment of the trial court in the proceeding wherein he is adjudged in contempt, *provided that court possessed jurisdiction*[1]. We may consider the facts only for the purpose of determining whether they constituted acts sufficient to confer jurisdiction upon the court to make the particular order."

This court, no doubt, had a reason for using the phrase "provided that court possessed jurisdiction." We think it was because no man should be adjudged in contempt of court unless the judgment is based on facts in evidence, or, in the absence of evidence, unless the judgment recites the facts on which it is based.

1.—Emphases added throughout this opinion.

The case out of which the contempt judgment grew was vigorously contested in the trial court. Counsel opposing the relator questioned Frank Stephenson at great length. The record shows that many times he would break into an answer to propound another question. The relator in many instances did not object. When he made objections he frequently addressed the court: "Your Honor, please," and if the court overruled the objection he would state: "Note our exception."

Many times during the hearing the court would interrupt a question or an answer or even break in the middle of an objection. Relator was under a sworn duty as an attorney and in the exercise of that duty he had the right to make objections and to request, if the objections were overruled, that his exception be noted.

We have carefully examined the statement of facts in this case and we fail to find any evidence to justify the conclusions reached in the trial court's judgment. The majority opinion admits, in effect, that if we look only to the record, the relator might be entitled to a discharge under holdings in cases like Ex Parte Crenshaw, 96 Texas Crim. Rep. 654, 259 S.W. 587, 31 A.L.R. 1181. But, because of recitations contained in the order (which we say are not supported by the record and are not in themselves sufficient to sustain the order), the majority resolves the matter in favor of its validity.

The majority opinion divides the case into two episodes.

The first episode relates to the incident when the court held relator in contempt and assessed a fine of $100.00 as punishment. The majority opinion admits that relator was right in the controversy that provoked the judge to assess the fine. However that may be, the order of the judge does not order relator to be confined until the fine is paid and relator's application for writ of habeas corpus seeks only release from the restraint imposed by the order. Moreover, at the time the fine was imposed relator was clearly guilty of no conduct which could be regarded as contemptuous under Ex Parte Crenshaw and other decisions of the courts of this State to be hereafter noted. Assuming that when the judge thereafter ordered the fine paid by one o'clock, the judge correctly interpreted the remark made by relator— which was unintelligible to the court reporter—as "we will see about that," and that such remark in itself was contemptuous, it will not support any part of the judgment because it was made after the fine was imposed and the subsequent order of confine-

ment does not purport to be in punishment for that remark. It follows that unless the second episode and the order entered thereon furnish a sufficient basis for relator's continued confinement the writ applied for should issue.

The facts constituting the second episode as recorded by the official reporter are set out in the majority opinion. As heretofore stated, the majority opinion indicates that if that was all we had before us and we were to follow cases like Ex Parte Crenshaw, relator would likely be entitled to a discharge. Quoted also in the majority opinion are pertinent parts of the court's order on which the majority opinion rests. They need not be repeated. They do need to be analyzed in the light of the official record.

The second episode arose out of a colloquy between the court and relator regarding the right of relator to object to a question by opposing counsel before it had been completely phrased. The court had the unfinished question read by the reporter. The court's order then recites "* * * and that the court then and there admonished the said Frank Sentell to go slow and take things easy and let the counsel ask and propound the question in full and give the witness time to answer and he, the said Frank Sentell, the proper time to make objection, and if this rule was followed that the matter could be straightened out very easily and that he could have and protect his rights * * *." This recitation, though perhaps not accurately reflecting the record, finds substantial support in the Court Reporter's record, as follows: "THE COURT: It wasn't no question. You interrupted the man and didn't give him a chance to finish. Now, go slow and I will try to separate this stuff and give you both your full rights." The order then continues: "* * * and that in defiance of the court's suggestions and admonitions the said Frank Sentell continued to argue and harangue said court and insist that the witness be permitted to answer the unfinished question." This recitation not only has no support in the record, it is directly contrary to the record. In the first place, relator was trying, by objection, *to prevent* the witness from answering the question rather than insisting that he *be permitted* to answer it as recited by the court. Furthermore, the record clearly reflects that the only thing said by relator following the aforementioned admonition was "Note our exception." This can hardly be said to support the recitation that relator "continued to argue and harangue" the court. Thereupon rather than let relator have his exception for whatever it was worth as customary decorum on the part of the court required, the court said: "You don't have any exception." Relator then stated: "We ask the record to show it." Relator could have

said no less if he thought his client's rights were being transgressed. Surely it cannot be thought that there was anything of a contemptuous nature in the words spoken by relator, and the court's recitation that by saying them relator "continued to argue and harangue" the court is without any basis in fact.

The recitations in the court's order continue: "That this court then and there again admonished the said Frank Sentell that if he continued to argue this point with the court after the court had ruled, that this court would have to hold him, the said Frank Sentell, in contempt and confine him to jail * * *." This recitation seems to be supported by the Court Reporter's record as follows: "THE COURT: Well, I am going to put you in jail if you keep on." It may be noted, however, that this admonition was not made in response to any effort on the part of relator to continue "to argue the point after the court had ruled," but was made in response to relator's request that the record show his exception. The order continues: "* * * at which time the court did not catch the side-bar remark made, but it was evident to this court from the expression and attitude, of the said Frank Sentell that he then and there, as he had in the past, defied the court to hold him in contempt." The only basis for this recitation is found in the official record as follows: "MR. SENTELL: (Sounds unintelligible to the reporter)."

From the foregoing analysis, it is quite obvious that the court did not rest its judgment upon the nature of words spoken by relator, nor upon his interruption of a question of opposing counsel by objection, nor upon frivolous or unfounded objections made with the view of harassing the court and impeding justice, nor upon arguing with and haranguing the court. Rather, it was rested upon "the expression and attitude" of relator. It is upon this recitation also—a "contemptuous attitude"—that the majority has denied the writ.

There seems to be a division of authority as to whether the intonations of voice, the vehemence of objections or the physical attitude of counsel will render contemptuous words which are otherwise proper. 17 C.J.S., Contempt, Sec. 8, p. 11. But accepting the view that an order of contempt may be founded alone upon the connection in which the words are used and the look, manner and emphasis of the speaker, there is yet strong, and, we think, sound authority that before the order may be sustained as valid it must recite the *facts* which constitute the contempt as distinguished from simple conclusions. Crites v. State, 74 Neb. 687, 105 N.W. 469; People v. Sherwin, 354 Ill. 371, 188 N.E. 484; Ex Parte Pugh, 30 Ariz. 129, 245 Pac. 273.

The reasons for the rule are stated in Crites v. State. In that case counsel continued a certain line of interrogation despite several warnings by the court and finally advised the court that he was going to ask another question in spite of the court's admonition. After reciting the facts the court's contempt order continued: "and the court being fully advised in the premises finds that said Albert W. Crites is guilty of contemptuous and insolvent behavior towards the court and is in contempt of court." The Supreme Court of Nebraska struck down the order, saying: "In such a case it is absolutely necessary for the preservation of the liberties of the citizen that in recording the conviction the court shall state the *facts* showing the contempt charged. It is not sufficient to state in a general way the conclusions of fact on which the conviction is based. The facts themselves must be stated, from which the reviewing court can see that the ultimate fact of guilt is properly and justly found. * * * No intendments or presumptions can be indulged in to sustain the judgment of the trial court in a contempt proceeding. Such a proceeding is criminal in its nature and the rules governing criminal proceedings are applicable thereto."

There is contrary authority, but we believe the reasoning underlying the cases illustrated by those above cited is sound.

To obviate the type of proceeding illustrated by the case at bar some states have enacted statutes, requiring the court's order to set out the facts on which it is based. Illustrative of the strict compliance required under such statutes is the case of State ex rel Breen v. District Court of Silver Bow County, 34 Mont. 107, 85 Pac. 870. In that case the contempt order recited that the contemnor "Knowingly and wilfully addressed the court in a contemptuous, insolent, and disrespectful manner, and in an insolent, contemptuous and sneering manner called, and attempted to call, the said Honorable Michael Donlan, judge as aforesaid, to prove and attempted to prove by said judge certain scandalous matters * * *." In striking down the order the Montana court said: "It states conclusions and inferences only, drawn by the judge from the facts as they transpired; thus leaving this court no alternative but to accept these conclusions or to hold the order invalid." Our limited investigation shows that at least California and Oklahoma have statutes making similar requirements.

Most of the outstanding cases in this State on direct contempt have been decided by our Court of Criminal Appeals. While we are not bound to follow the decisions of that court,

the respect which it commands from this court dictates that we give great weight to its decisions and that we harmonize our decisions therewith whenever possible.

In Ex Parte Kearly, 35 Texas Cr. Rep. 634, 34 S.W. 962, the trial judge demanded that relator apologize before proceeding in the trial of a case and stated that relator was being spoken to in all kindness, whereupon relator said: "I don't want you to treat me kindly. You can talk me out of court. I want you to treat me as mean as you know how. I want to say that nothing you can do will ever make me look upon you with regard again." While relator was discharged on other grounds, the court noted that relator had not been guilty of contempt, owed no duty to purge himself, and wholly discounted the boisterous manner in which he addressed the court.

In Ex Parte Snodgrass, 43 Texas Cr. Rep. 359, 65 S.W. 1061, relator charged in his argument to the jury that one of two witnesses giving diametrically opposite testimony was either mistaken or had lied. This precipitated a physical encounter between relator and one of the witnesses and the trial judge held relator in contempt. He was discharged by the Court of Criminal Appeals, that court holding that what relator said was correct, and continuing: "Courts will look with much allowance upon the zeal and partisanship of counsel representing their clients in the courts. Without zeal and without an honest and fervent desire to have everything done and to do everything that can be done within his power that is honorable to promote the interests of his client, and secure him a fair and impartial trial, the object of counsel would be destroyed, and the bar would soon fall into disrepute."

In Ex Parte Miller, 92 Texas Cr. Rep. 489, 244 S.W. 612, it appears that in the trial of a criminal case the defense of former jeopardy was interposed, based on the contention that a jury in a former trial had been discharged too soon. The contempt order grew out of the jury argument of relator, counsel for defendant. The contempt order contained recitations showing relator had used strong language which was highly critical of the court's action in discharging the jury on the former trial. The relator was discharged by the Court of Criminal Appeals, it being said that there was some factual basis for relator's comments, and the court said: "The right or wrong of the court's former discharge of the jury had become an issue before this jury, and we are forced to conclude that *relator might urge the wrong of it even in a loud, vehement, and arrogant manner,* provided his language

and manner be decent and such as he might fairly use in discussing the acts or testimony of any other citizen in a court of justice."

With these pronouncements before us, what were the facts surrounding the unintelligible remark of relator that formed the basis of the trial judge's conclusion that he had a "contemptuous attitude?" The order does not tell us. Therefore, this Court has no way of reviewing his conclusion. Did those acts come within the classification of mere excessive zeal and partisanship? We cannot know, but if so they were not contemptuous. Did he protest against what he deemed to be a wrong inflicted by the court in a loud, vehement and arrogant manner? We cannot know, but if so it was not contemptuous. Did he sneer at the court? The court does not so find. Did he make meaningful signs at the court? We do not know. All we know is that the court found that he exhibited a "contemptuous attitude"—a pure conclusion which we are unable to review because of the failure of the order to recite the facts. Because of this failure the order should be held to be void.

If a contempt order may rest upon pure conclusions, the great writ of habeas corpus has lost its value to one illegally deprived of his liberty because the court from which it is sought will have no power to review the facts upon which the commitment is based.

Relator acted within his rights when he took his bill of exceptions. We cannot escape the conclusion that the unjudicial conduct of the court climaxed by the remark "You don't have any exception" precipitated whatever attitude relator thereafter displayed, although his only intelligible reply was: "We ask the record to show it." What was said by the Court of Criminal Appeals in Ex Parte Duncan, 42 Texas Cr. Rep. 674, 62 S.W. 762, seems not inappropriate here:

"We wish to say that the power of the Court is official—judicial, and not personal—and the relations of Court and attorney are correlative. Courts may, will and should enforce judicial power and functions when necessary; yet this must be done in a manner sanctioned by law, and in consonance with judicial dignity, and with due regard to the rights of parties to be affected. Attorneys are bound and will be held to obey legal orders of courts, yet the court should invoke its judicial authority under the law and in obedience thereto. The relationship of court and attorneys, bench and bar, are reciprocal, and each, in their pro-

per sphere, is clothed with powers, rights and privileges, which are to be recognized and respected by the other. These relations should be recognized and respected alike by the bench and bar, and being carefully kept in view and followed as rules of action and conduct, will avoid friction."

We conclude that there are no facts in the record supporting the contempt order and there are not recitations of facts in the order itself supporting it. The order should therefore be held void and relator discharged.

Delivered February 24, 1954.

Rehearing overruled April 21, 1954.