### Ex Parte Max Andrews.

No. 3795.   Decided February 27, 1907.

**1.—Habeas Corpus—Contempt—Proof—Judgment.**

When one is adjudged guilty of a contempt of court, the fact of contempt should be ascertained and determined by the court, and that this adjudication should be entered in the minutes of the court and a writ of commitment thereon issued. The question, however, is one of proof.

**2.—Incriminating Evidence—Privilege—Waiver—Witness.**

A witness must claim his privilege at the threshold; he cannot give a part of the testimony that might be in his favor or disclose some of the facts, and then refuse to give other facts known by him; that is, if he once waives his right he

cannot afterward stand on his privilege. Yet the court himself is the final judge as to whether or not the testimony is privileged.

### 3.—Jurisdiction—Subject Matter—Investigation—Grand Jury.

Before any witness can be held in contempt of court, the court must have jurisdiction of the subject matter of investigation, and when the contempt is with reference to the proceedings of the grand jury, it must be shown that the grand jury was then engaged in an endeavor to disclose and to bring to punishment some criminal offense by indictment.

### 4.—Same—Case Stated—Street Car Strike—Libel.

Where it appeared from relator's statement that during the term of the district court, while the grand jury was in session there was a strike of the employees of an electric street car system, etc.; and that during this time some one dynamited a gambling resort and that a number of persons were therein, but no injury was done to either person or property, except that some money disappeared; and about that time a severe criticism of the owners of said street car company appeared in a local newspaper, which denounced them as thieves and outlaws; and it did not appear which offense, if any, the grand jury was engaged in investigating, and whether or not it incriminated relator, it could not be determined whether he was in contempt in refusing to answer the question propounded to him by the grand jury, and whether the court was authorized to fine him for contempt, and he was discharged.

### 5.—Same—Anti-Trust Law—Justice of the Peace—Immunity—Boycotting.

Where relator refused to answer questions propounded to him by the grand jury, upon which he was fined for contempt by the court, and inasmuch as the investigation was not before a justice of the peace, and involved boycotting and violations of the anti-trust law of 1903, and that relator was not offered immunity, he was not compelled to answer such questions. Brooks, Judge, dissenting.

From Harris County.

Original application for habeas corpus for release from a commitment for contempt for refusing to answer certain questions propounded by the grand jury.

The opinion states the case.

No brief on file for relator.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—This is an original application to this court for writ of habeas corpus by the relator Max Andrews, seeking to be discharged from an alleged illegal restraint by the sheriff of Harris County, under a contempt proceeding from the Criminal Court of said county. It appears from relator's statements that during a term of the court held in Harris County in 1904, while the grand jury was in session, there was a strike of the employees of the Electric Street Car System of Houston as against their employers, one H. F. McGregor being the manager of said system; that on account of the strike the employees were discharged and certain other employees were brought to take their places; that during this time some one dynamited Barney's place, which was a gambling resort, and at the time a number of persons were there engaged in gambling, and during the confusion some money was taken from the place. It is also made to appear that probably the labor unions of Houston took part in favor

of the former employees, the strikers, and evidently a good deal of confusion and excitement existed in the City of Houston. It appears that a general boycott was enforced against said Street Car Company, and very few people patronized or rode upon the cars of said company, and it was recognized that the labor organizations of said city had actually boycotted said Street Car Company under and by virtue of certain resolutions passed by certain labor organizations, and it seems that there was an effort being made to indict the leaders in said boycott and especially the members of the committee representing said labor organizations in its differences with said Street Car Company for violating what is known as the anti-trust laws of the State of Texas. At this time the Criminal District Judge, the Hon. J. K. P. Gillaspie, had the grand jury to come before him, of which H. F. McGregor was a member, and instructed said grand jury, among other things, as follows:

"Gentlemen:

"There have transpired several things in the last few days that it is made my duty to call your attention to, which have come to me officially, as well as in the public prints. One of them I expect you are as well informed about as I; that is, the matter of dynamiting here in town. One place over a saloon; and because the place was an unlawful one does not make it lawful to dynamite it; the law makes it an attempt to destroy human life and property to act in any such way. Those things are to be dealt with according to law. I call your attention to it, and want you to investigate that matter, and if possible to bring to justice the parties so offending.

"I will also call your attention to matters arising here, of acts which are prohibited by law, and which are covered by this statute. The statute reads thus:

" 'Where any two or more persons, firms, corporations or association of persons shall agree to boycott or threaten to refuse to buy from or sell to any person, firm, corporation or association of persons for buying from or selling to any other person, firm, corporation or association of persons.'

(Act of March 31, 1903, Legislature of Texas, section 3, paragraph 2, pages 119 to 123.)

"This is a violation of the Anti-Trust law of this State. It is your duty to investigate these matters; and if such is the case, that indictments be found against the persons so guilty or offending.

"What has caused these matters, I suppose you are familiar with as I am, but it is not for me to take any decided stand upon either side, but to call your attention to the law as I have read it, and, I ask you to look into these matters, and if you find the law has been violated, to find indictments against the persons guilty of it. You will now retire."

Subsequent to this the relator Max Andrews was brought before said grand jury, and he was asked the following questions:

"1. Do you know from personal knowledge or otherwise the principals or any one connected with the dynamiting of Barney's place?

"2. What labor unions have placed the Houston Electric Company and Highland Park on the unfair list and authorized the fine of any of its members for riding on the street cars or visiting Highland Park?

"3. Has the Musicians' Union authorized a fine of $15 on any of its members who ride on the street car and forbidden any of its members to play at Highland Park?

"4. Has the Bartenders' Union forbidden any of its members to work at Highland Park?

"5. Has the Carpenters' Union authorized a fine of $2.50 a day on any of its members who serve as special officers on the street cars?

"6. Give the names of any members of the committees of the Labor Council, other than yourself, who are coöperating and working to establish a boycott of the cars of the Houston Electric Company or to have same placed on the unfair list?

"7. Give the names of any persons who have approached you and suggested plans for boycotting the cars of the Houston Electric Company.

"8. Give the names of any persons who have refused to sell goods to people who have ridden on the cars of the Houston Electric Company.

"9. Have you any personal knowledge as to who the parties were that dynamited Barney's place?

"10. Give the names of the parties who have knowledge of the perpetrators of the dynamiting of Barney's place.

"11. Give the names of any persons that can connect the employees of the Street Railway with having been guilty of dynamiting at Barney's place.

"12. Give the names of any employees of the Street Railway Company, or parties that can furnish the same, that were gambling at the time and witnessed the dynamiting of Barney's place.

"13. What information have you that would connect employees of the Street Railway Company with the dynamiting at Barney's place as indicated in the daily edition of the Labor Journal?"

The relator refused to answer the above questions, and was then brought before the criminal district judge, and the circumstances of his refusal, submitted by the grand jury to him, were made known to the court, whereupon the judge required him to answer said questions before said body, which he refused to do, claiming the answers thereto would tend to incriminate him; whereupon, the judge again required him to answer said questions, which he refused to do, and he was adjudged guilty of contempt of court, and his punishment assessed at a fine of $100, and that he be committed to the Harris County jail until he is willing to testify before said grand jury and give

answers under oath to said questions so propounded by said grand jury, etc.

It is claimed by relator that no judgment was entered against him at the time and none until after his leaving the City of Houston by rail for the City of Rockdale in Milam County, for the purpose of obtaining the writ of habeas corpus, and he insists that he should be relieved and discharged under the rule laid down in Ex parte Kearby, 35 Texas Crim. Rep., 634. In that case we held that when one is adjudged guilty of a contempt of court, that the fact of contempt should be ascertained and determined by the court, and that this adjudication should be entered in the minutes of the court, and a writ of commitment thereon issued; that an imprisonment could not be imposed and executed upon merely a verbal order of the court, nor could the record be completed after the writ of habeas corpus had been sued for. This relates to actual contempts in the presence of the court such as we consider this case. The question, however, is one of proof. While we find a judgment and writ of commitment in the record, we do not find any proof outside of the recitations in the application that shows the order of commitment was not entered prior to the suing out of the writ of habeas corpus.

Relator further maintains that he should be discharged because he could not safely answer the questions propounded to him by the grand jury under the direction of the court without incriminating himself; that is, that the testimony which he would give might tend to incriminate him. In Ex parte Park, 37 Texas Crim. Rep., 590, this question was discussed and the authorities reviewed, and it was there held that a witness must claim his privilege at the threshold; he could not give a part of the testimony that might be in his favor or disclose some of the facts, and then refuse to give other facts known by him; that is, if he once waives his right he cannot afterwards stand on his privilege. It was further held that while it was incumbent on the witness to assert his privilege and to be the judge thereof in the first instance, yet that the court itself was the final judge as to whether or not the testimony was privileged, and he should determine this from all the circumstances connected with the investigation within his knowledge, and from the environments of the case. Of course, this would apprehend that the judge must be informed as to what matter was being investigated and enough of the circumstances to enable him to determine the question of privilege. For the purpose of determining this question, it may be stated that the questions propounded to the witness divide themselves into two classes suggesting two different lines of investigation, though involving the same subject-matter. Questions 1, 9, 10, 11, 12 and 13, relate to interrogatories intended to ascertain who it was that dynamited Barney's place. The other questions, from 2 to 8 inclusive, relate to assumed violations of the Anti-Trust law of 1903 (see laws of the 28th Legislature, pages 119 to 123); that is, they relate to certain questions

calculated to disclose the witness' knowledge of boycotting by certain labor unions of certain firms and corporations including the Houston Electric Company. Of course, it will be conceded that before any witness can be held in contempt of court that the court must have jurisdiction of the subject-matter of investigation, and when the contempt is with reference to the proceedings of a grand jury, it must be shown that the grand jury was then engaged in an endeavor to disclose and to bring to punishment some criminal offense by indictment. See McDonough v. State, 11 Texas Ct. Rep., 972. Now, what criminal offense was the grand jury engaged in investigating when they interrogated the witness as to who it was that dynamited Barney's place. If any one was killed there, the record furnishes no information thereof, nor are we even informed that any injury was done to property there. It seems to be assumed that the place was dynamited, and it is shown that a number of persons were there in the application for the writ; and in a certain editorial, which constitutes a part of the record, taken from the Houston Labor Journal, which appears to have been edited or controlled in some way by the relator. We quote from that paper, as follows: "The Houston Street Car Company's importation of two hundred and fifty thugs, thieves and outlaws from the slums of St. Louis to take the places of honest Houston workingmen has borne its legitimate result.

"The dynamiting of the gambling house last night and the robbery of the house of about $1,200 is a new kind of outrage in this part of the country, and is traceable directly to the scab desperadoes of the street car company from the dives of St. Louis.

"The circumstances going to show this outrage was committed by some of the hired outlaws of the street car company are summed up as follows:

"First. The scab employees of the street car company were paid off yesterday.

"Second. The gambling house was full of these scab employees of the street car company at the time of the explosion, and they had been playing at the games all evening.

"Third. After the dynamiting and robbery the fugitives were seen running toward the San Jacinto bridge. This is the shortest dark route from the scene of the outrage toward the street car company's power house, where the regiment of outlaw scabs are entrenched.

"Four. The inference is that a corporation that was careful enough to see that its gang of 250 toughs was headed by a professional murderer, would also see to it that there were professional dynamiters in the crowd. The use of the professional dynamiter by such infamous corporations as the Houston Street Car Company is to lay the blame on the strikers and thereby undertake to win public sympathy.

"Five. The importation of two hundred and fifty lawless characters and the backing them up by the street car company in every act of lawlessness that they have committed since they have been in this

city, is calculated to make bolder and more audacious such an element of· professional toughs.

"Now, every right thinking man in Houston must conclude that if there is need for a 'law and order' organization, it must be one that is not under the domination of the Houston Street Car Company, as is the Citizens' Alliance.

"Is it not about time for an official investigation of this scum of the earth quartered at the street car power house? If detectives of national acquaintance could be secured to inspect the ruffian army imported into Houston, they might perhaps find in them a choice lot of faces known among the police rogue's galleries over the country, and 'wanted' elsewhere. It would be well to stop any reign of terror in this city by such a menacing gang of thugs right at the outset."

Taking this editorial and the judge's charge, in connection with the application of the relator for a writ of habeas corpus, it is possible that the grand jury may have been investigating an assault to murder some one, or the theft of $1,200 or a part thereof, or some injury to the property at Barney's place, or it is possible, that the grand jury may have been investigating the publication of the article in question, in order to determine whether or not the writer or publisher of said article was not guilty of libel, in attributing the dynamiting of Barney's place, and the results ensuing therefrom, to the Houston Electric Company, or its officers. All we can say as to this matter is that we are left to speculate as to what offense the grand jury was engaged in investigating, and we are equally left in the dark from this record as to the particular environments or circumstances surrounding the· special matter of investigation, which would enable us to clearly determine whether or not relator was in contempt in refusing to answer the questions. If relator himself dynamited Barney's place, or if he was engaged with those who did dynamite it, we can readily see how his answers to the questions might tend to incriminate him. If he was not engaged by himself, or with others in dynamiting Barney's place, his attributing it to· the street car company or to its management, might subject him to a prosecution as for libel. While in the article in question he does not state directly that the street car company was guilty of dynamiting Barney's place, the effect of the article is to "fasten it on said street car company, and if that is false he might subject himself to an indictment for libeling said company. So that, in the uncertain state of this record it appears to us that the answers of the witness might tend to incriminate him, and inasmuch as he is the judge thereof in the first instance, and we are not advised of the circumstances and environments which would suggest or tend to suggest that his answers could not incriminate him, we must hold that he was not in contempt of court in declining to answer the questions propounded to him in regard to said matter. As stated before, the other questions involved violations of the Anti-trust law of 1903. We note that that law

provides that when a party is made a witness in that character of case before a justice of the peace, he can be compelled to testify and is relieved from any prosecution, but the fact that this statute is special in its terms and relieves the witness when the proceedings are before a justice of the peace, in our opinion would confine it to that tribunal, and not extend it to a district court, or a grand jury, which is a part of the district court; and moreover, we do not find from this record that he was offered any immunity. So that, if he knew of these matters inquired about as to boycotting the Houston Electric Car Company, and as to boycotting certain merchants by certain labor unions, it would occur that he must know of such matters by virtue of his participating in such boycotts, and inasmuch as he was offered no immunity, and inasmuch as this investigation was not before a justice of the peace, we hold that he was not compelled to answer the questions. It is, therefore, considered that the relator be discharged.

*Discharged.*

BROOKS, Judge (dissenting opinion).—I do not agree with the opinion of the majority discharging the relator, but, in my opinion, the relator should be remanded to custody. And as my dissenting opinion I adopt the brief of the late Howard Martin, Esq., Assistant Attorney-General.

Relator was summoned before the grand jury of Harris County, and refused to answer certain questions propounded to him by said grand jury, after having been admonished to do so by the district judge. His reason for refusing to answer was, that it would incriminate him. Whereupon he was adjudged guilty of contempt.

The questions propounded by the grand jury are, as follows: (The questions will not be set out here, as they are copied in full in the original opinion.)

In reply to relator's contention urged in his brief and by the able oral argument of his counsel, the State submits the following:

1. Relator's contention that the judgment is void, because no order had been entered and commitment issued at the time of his supposed illegal restraint, under the agreed facts, is not well taken. The case of Ex parte Kearby, 35 Texas Crim. Rep., 644, cited by him is not in point, but the case of Ex parte Latham, 11 Texas Ct. Rep., 266, recently decided by this court decides this question adversely to relator's contention.

2. The State submits that questions 1, 9, 10, 11, 12 and 13, when considered in the light of all the surrounding circumstances adduced in evidence should have been answered by relator. All of these questions relate to offenses disconnected from violations growing out of what is commonly known as the Anti-Trust law, enacted by the Twenty-Eighth Legislature. (Acts 28th Leg., p. 119.) These questions fail to show upon their face that answers to them would tend to incriminate

relator, and no facts are shown which make it reasonably appear that
if he had answered them, such answers would have incriminated him,
or tended to do so.   But relator contends that he was the sole judge
as to whether his answering of these questions would tend to incrimi-
nate him.    The :State's reply is, that he was not the sole judge, that
the court should look to all the environments of the witness to de-
termine this question.   In support of this contention, the court is
referred to the following sections of Wharton's Criminal Evidence,
section 466, "To protect the witness from answering it must appear
from the nature of the evidence which the witness is called to give
that there is reasonable ground to apprehend that should he answer
he would be exposed to a criminal prosecution.   The witness, as will
be seen, is not the exclusive judge as to whether he is entitled on this
ground to refuse to answer.   The question is for the discretion of the
judge and in the exercise of this discretion, he must be governed as
much by his personal perception of the peculiarities of the case as
by the facts actually in evidence.   But in any view the danger to be
apprehended must be real with reference to the probable operation
of law in the ordinary course of things, and not merely speculative,
having reference to some remote and unlikely contingency."   He
further says, in section 469: "The witness is not the sole judge of
his liability.   The liability must appear reasonable to the court, or
the witness will be compelled to answer.   Thus a witness may be
compelled to answer as to conditions which he shares with many
others, though not as to conditions which would bring the crime in
inculpatory nearness to himself.   But in order to claim the protection
of the court the witness is not required to disclose all the facts, as
this would defeat the object for which he claims protection.   It is
not, indeed, enough for the witness to say that the answer will crimi-
nate him.   It must appear to the court, from all the circumstances,
that there is a real danger; though this the judge, as we have seen,
is allowed to gather from the whole case, as well as from the general
conception of the relations of the witness.   Upon the facts thus
developed it is the province of the court to determine whether a direct
answer to a question may criminate."

In Ex parte Parks, 37 Texas Crim. Rep., 590, this court said:   "We
hold that this matter is in the first instance to be determined by the
court or judge; that is, it must appear to the court from the character
of the question and the other facts adduced in the case that there is
some contingency and substantial probability that the answer of the
witness may help to convict him of a crime.   The liability must ap-
pear reasonable to the court or the witness will be compelled to an-
swer."   See authorities cited in the Parks case.   The State, there-
fore, submits that when these questions, and the facts surrounding
the transactions in question, are tested by the above rule, the relator
was in contempt in refusing to answer the questions above referred to;
and that the court properly fined him for contempt.

3. It may be (though it is not conceded) that questions 2, 3, 4, 5, 6, 7 and 8, which relate to violations of the State Anti-Trust law, when read and construed in the light of all the circumstances as shown in this record, that the answering of them would have tended to criminate relator. But the State's reply is, that relator should have answered all of these questions, for the reason that his answers could not, under the Anti-Trust Law, section 15 thereof, have criminated him, because it provides, that "Any person so summoned and examined shall not be liable for prosecution for any violation of the provisions of this act about which he may testify fully and without reserve." If relator was exempt from prosecution by this statute, when compelled to give evidence against himself, he should have been required to testify. Of course, the exemption must be absolute. Ex parte Carter, 66 S. W. Rep., 540. But relator contends that the above quoted clause of said Anti-Trust Law is unconstitutional, for the reason that the persons so summoned and required to testify are only exempt from prosecution, when they "testify fully and without reserve." The State's reply to this insistence is, that inasmuch as it was the clear intent of the Legislature to exempt a witness from prosecution if he was required to testify under this statute, that he could not be successfully prosecuted for any transaction about which he was compelled to testify, even though he did not "testify fully and without reserve." That if the State compelled him to testify and appropriated his testimony to the benefit of the State, the State would be estopped from ever prosecuting him about matters to which it had compelled him to testify; and that if he should be indicted, because he did not testify "fully and without reserve" in that prosecution he could defend on the ground that this clause of the statute was unconstitutional.

But relator further contends in this connection that, because the offense denounced by this statute is a felony, and therefore would bring him (the witness) into disgrace and cast odium upon him, he cannot be compelled to testify. Under the common law this contention might have been of some force. But under the rule adopted in this State it can not avail the objecting witness. McCoy v. State, 27 Texas Crim. App., 415; Owen v. State, 7 Texas Crim. App., 329.

4. The court will observe that a copy of the judgment, adjudging relator guilty of contempt filed in this record, shows that relator declined to answer each and every question propounded. Therefore, the State submits that, if relator should have answered either of said questions, and wrongfully refused to answer it, he was promptly adjudged guilty of contempt. He should have indicated which questions would have incriminated him, if in fact either would have done so. And again, if either of said questions should have been answered by relator, this court will presume that he was adjudged guilty upon a question which he should have answered, as all presumptions are with the trial judge, and the validity of his orders.